UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| BRIAN RUBY, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: _____ |
| v. | ) ) ) | CLASS REPRESENTATION |
| UNITED SERVICES AUTOMOBILE ASSOCIATION and CCC INFORMATION SERVICES, INC., | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Capt. Brian Ruby, individually, and on behalf of all others similarly situated ("Plaintiff"), by and through the undersigned counsel of record, files this Class Action Complaint against Defendants, United Services Automobile Association ("USAA") and CCC Information Services, Inc. ("CCC") (collectively, "Defendants"), and states:

## NATURE OF THE ACTION

1.      This class action arises from Defendants' systemic and intentionally wrongful under-valuation of total losses involving the vehicles of USAA first party insureds.

2.      USAA has spent many tens of millions of dollars to market itself as a fair and honest insurance company. However, USAA is not fair and honest in providing valuations to USAA insureds whose vehicles have been involved in an accident and are determined to be a total loss.

3.      Through its auto insurance policy contracts, USAA has agreed to provide, *inter alia*, collision coverage for losses resulting from damage to insureds' vehicles.  When the costs of repairs exceed a specified percentage of the vehicle's value, USAA declares the vehicle a total loss and must fairly adjust that total loss claim by properly valuing the insured vehicle.

4.      USAA has contracted with CCC to receive Market Valuation Reports (the "CCC Reports") to determine the "Base Vehicle Value" of a total loss vehicle and the "Adjusted Value" after any "Condition Adjustment" and applicable deductible.  Through this agreement with CCC, USAA and CCC have engaged in a scheme to artificially deflate the value of the total loss claims with the specific intent to pay first party insureds less than the actual pre-loss value of total loss vehicles by making improper downward adjustments for the "condition" of the total loss vehicle, the purported comparable vehicles, or both.

5.      Plaintiff and the putative Class are USAA automobile insurance policy holders whose vehicles USAA determined to be a total loss, and who have been subject to USAA and CCC's scheme to artificially deflate the value of their total loss claims by making such improper downward condition adjustments.

6.      When it entered into the policies at issue in this case with Plaintiff and Class Members, USAA was aware, but failed to disclose to Plaintiff and the Class, that CCC's Reports would wrongfully under-value total loss vehicles and that USAA would intentionally underpay total loss claims based on those Reports.  Through this scheme, USAA and CCC have engaged in unlawful conduct in violation of Florida law, and their respective contractual obligations and have thereby uniformly damaged USAA insureds in Florida in a readily ascertainable dollar amount.

## PARTIES, JURISDICTION AND VENUE

7.     Plaintiff, Capt. Brian Ruby, is an adult citizen of Riverview, Hillsborough County, Florida.

8.     Plaintiff brings this action in his individual capacity and on behalf of the Class of all other persons similarly situated in the state of Florida.

9.     Defendant United Services Automobile Association is a foreign corporation operating under the laws of the state of Texas with its principal place of business in San Antonio, Texas.  USAA issued automobile liability insurance policies, including coverage for property damage and first-party total loss claims, to Plaintiff and Class Members, and many thousands of other insureds who have not incurred a total loss in Florida.  USAA is subject to general and specific jurisdiction in Florida.

10.     CCC Information Services, Inc. is a foreign corporation operating under the laws of the state of Illinois with its principal place of business in Chicago, Illinois.  CCC has entered into a contract with USAA to prepare and provide all USAA total loss insureds with purported valuations for total loss vehicles in the form of CCC Reports throughout the class period.

11.     CCC has received very substantial payments from USAA for such valuations.

12.     CCC has provided thousands of total loss valuations for USAA insureds in Florida.  CCC also provides CCC total loss valuations for thousands of Florida insureds of other insurance companies including Allstate.  CCC has engaged in the total loss valuation business in Florida and has committed tortious acts in Florida, as alleged herein.  CCC is subject to jurisdiction under the Florida long arm statute, Florida Statute § 48.19.

13.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

and is a class action in which Members of the Class are citizens of a state different from each of the Defendants.

14.     Venue is proper pursuant to 28 U.S.C. § 1391 in that Plaintiff resides in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants are authorized to conduct business, or actually conduct business in this District and have intentionally availed themselves of the laws and markets within this District through distribution and sale of their products and services (insurance policies and total loss valuations, respectively) in this District, do substantial business in this District.

## GENERAL FACTUAL ALLEGATIONS

### A.     Plaintiff's USAA Policy

15.     Plaintiff, Capt. Brian Ruby, was the owner of a 2014 BMW 3 Series 328i RWD (the "Vehicle").

16.     USAA issued its Automobile Policy No. 03476518371028 (the "Policy") to Plaintiff which insured the Vehicle.  The Policy was effective from December 21, 2015 to the present.

17.     Following an automobile accident with another vehicle operated by a third party, on July 25, 2019, USAA determined that Plaintiff's Vehicle was a "total loss."

18.     The terms of USAA's Policy issued to Plaintiff are not individualized, unique or specific to Capt. Ruby.  Plaintiff's Policy is the same standard form used by USAA in Florida. Plaintiff's Policy is attached to Exhibit A.

19.     The USAA Policy at 21, defines "Actual Cash Value" as "the amount that it would cost, at the time of loss, to buy a comparable vehicle."   Further, the USAA Policy,

Amendatory Endorsement at 3, Part D, Physical Damage Coverage, Limit of Liability (A), requires USAA to pay the "actual cash value" of the [total loss] vehicle."

20.     CCC provided USAA with a CCC Market Valuation Report ("Plaintiff's Report") for Plaintiff's Vehicle on or about July 26, 2019.  CCC Reports generally are discussed in detail in Section B, immediately below.

21.     On July 26, 2019, USAA provided Plaintiff a CCC Report purporting to state a "Base Value" in the amount of $12,352.00, and an "Adjusted Value" of $12,520.00 after a positive condition adjustment in the amount of $168.00.  On October 2, 2019, USAA provided Plaintiff with a revised CCC Report purporting to state a "Base Value" in the amount of $13,127.00, and an "Adjusted Value" of $13,295.00 after a positive condition adjustment in the amount of $168.00.  USAA ultimately paid Plaintiff the amount of $13,295.00 for the purported "actual cash value" of his Vehicle.   True and correct copies of Plaintiff's CCC Reports are attached and incorporated herein as Exhibits B and C.

**B.     <u>The USAA and CCC Contract</u>**

22.     USAA and CCC entered into a contract to provide CCC Market Valuation Reports to USAA insureds such as Plaintiff and the Class. As explained in detail below, CCC (the "Reports" or "CCC Reports") Reports include purported market values of total loss vehicles based upon improper and unlawful methodologies.

23.     The agreement between USAA and CCC is described on the first page of the Report Summary as follows:

> The CCC ONE® Market Valuation Report reflects CCC Information Services Inc.'s opinion as to the value of the loss vehicle, based on information provided to CCC by United Services Automobile Association.

*Id.* at p. 1.

24.     The Reports specifically bear the names of both CCC and USAA on the first page of each Report.

25.     In addition, each Report has the name, Florida address, and the claim number of the individual USAA insured whose total loss vehicle is the subject of the Report. Thus, Plaintiff's claim information, including Plaintiff's name and address appear on this first page of Plaintiff's CCC Report.

26.     Each CCC Report contains a Valuation Methodology, which is described on the second page of each CCC Report.  See Plaintiff's Report, Exhibit B.

**C.     The CCC Methodology**

27.     The CCC Valuation Methodology ("CCC's Methodology") is explained in Plaintiff's Report as a four-step process used to determine the valuation.

28.     This four-step process includes:

Step 1 – Claim Inspection

Step 2 – Database Review

Step 3 – Search for Comparables

Step 4 – Calculate Base Vehicle Value

Exhibit B at 2.

29.     As discussed at 2 of Plaintiff's Report, CCC uses this purported methodology to calculate the "Base Vehicle Value."

30.     The Base Value is set out on page 1 of Plaintiff's Report under the heading "Valuation Summary."

31.     Steps 2, 3, and 4 are not based on statistically valid methodologies, algorithms, values or computations.  Each step is, in fact, statistically invalid and does not result in a proper valuation of "Actual Cash Value" for total loss vehicles in Florida.

**D.     Condition Adjustments to Comparable Vehicles**

32.     In the case of each Market Valuation Report, CCC selects "Comparable Vehicles" identified in its database search. Using its Valuation Methodology, CCC then makes purported adjustments to these Comparable Vehicles.

33.     CCC's Methodology for selecting Comparable Vehicles is statistically flawed and invalid, and, further, it is skewed towards identifying and utilizing Comparable Vehicles which are under-valued and do not fairly reflect Actual Cash Values.

34.     Specifically the CCC Methodology intentionally selects purported comparable vehicles which CCC has not inspected and which are not comparable for many reasons including excessive mileage or damage.  The CCC Methodology intentionally excludes vehicles in the database which are properly comparable to total loss vehicles.

35.     In addition, CCC's purported equity adjustments are statistically invalid.

36.     CCC's adjustments to Comparable Vehicles include adjustments for year/model/trim, options, mileage, and condition.  This is reflected on page 8 of Plaintiff's CCC Report.  None of these purported Comparable Value Adjustments are statistically valid or justifiable.  Adjustments for purported condition of Comparable Vehicles are hereinafter referred to as "Comparable Vehicle Condition Adjustments."

37.     In Plaintiff's CCC Report, CCC made negative or downward Condition Adjustments in exactly the same amount (-$788) to each of the Comparable Vehicles.  There is

no statistically valid or other proper basis for this negative or downward Condition Adjustment with respect to each of the Comparable Vehicles.

38.     CCC has no actual or accurate knowledge or information regarding the actual condition of Comparable Vehicles which it has not inspected.

39.     The note on page 9 of Plaintiff's CCC Report states that "the Condition Adjustment sets that comparable vehicle to Good condition, which the loss vehicle is also compared to in the Vehicle Condition section."

40.     There is no accurate or statistically valid set of facts under which this purported "process" could result in a downward Condition Adjustment in exactly the same amount of $788 for each of the comparable vehicles.

41.     The Base Vehicle Value reflected on the first page of every CCC Report is calculated by averaging the purported value of Comparable Vehicles after Comparable Vehicle Condition Adjustments.

42.     Thus, the direct effect of these Comparable Vehicle Condition Adjustments, is to reduce the Base Vehicle Value of Plaintiff's Vehicle by approximately $788.00.  CCC follows this same practice in each case in which CCC makes negative or downward Comparable Vehicle Condition Adjustments.

43.     In addition, although this did not occur in Plaintiff's case, CCC typically also makes condition adjustments to the insured's total loss vehicle as part of the fraudulent scheme alleged herein.

    E.    **Summary Regarding Condition Adjustments**

44.     The dollar amounts assigned to Condition Adjustments in the CCC Report to the Comparable Vehicles are wholly arbitrary and are not based on any statistical, objective, valid,

or verifiable data. Accordingly, all such downward Condition Adjustments are improper in all respects and should be disregarded in valuing a USAA insured's total loss vehicle.

45.     Because CCC's calculation of both Base Vehicle Value and the Condition Adjustments to comparable vehicles are statistically invalid, CCC's calculation of Adjusted Vehicle Value does not properly reflect the Actual Cash Value that USAA is contractually obligated to pay insureds pursuant to the auto insurance policy contracts it issues throughout Florida. (Exhibit A at p. 23).

46.     The intended and wrongful result of the four steps and, specifically, the Condition Adjustments included in the CCC Methodology, is that total loss vehicles are undervalued, and USAA insureds' total loss claims are underpaid. This underpayment is a detriment to USAA insureds, including Plaintiff and Class Members, and a benefit to Defendants.  Rather than paying Plaintiff and Class Members the proper sum of money for their total loss vehicles, USAA has retained significant funds in the millions of dollars by underpaying Plaintiff and Class Members for the value of their total loss vehicles.

**F.     USAA's Use of The Unlawful CCC Valuations**

47.     USAA contracted with CCC to receive the CCC Reports.

48.     CCC provided USAA with Reports for the total loss vehicles of the Plaintiff and the Class.

49.     USAA has a regular practice of informing insureds that the CCC Reports properly establish "Actual Case Value" and provide the basis for proper payment of total loss claims under USAA Policies in Florida.

50.     USAA has the regular and systemic claims practice of settling total loss claims based upon the CCC Reports.

51.     The Base Vehicle Values and the Adjusted Vehicle Value, including negative condition adjustments identified in the CCC Reports for vehicles of Plaintiff and Class Members, result in an underpayment of such total loss claims in the dollar amount of the condition adjustment.  The great majority of USAA total loss claims in Florida are, in fact, settled on the basis of the CCC Reports.

52.     USAA has actual knowledge that the CCC Methodology is statistically invalid and unlawful.

53.     USAA has suppressed and concealed material facts relating to CCC's Market Valuation System and its pre-existing scheme in conspiracy with CCC to intentionally under-value total loss claims, including those of Plaintiff and the Class.  Specifically, USAA concealed from Plaintiff that its purported total loss valuations were based upon the statistically invalid and unlawful CCC Valuation Methodology.

54.     Plaintiff and the Class Members have been damaged by USAA's systemic underpayment of total loss claims.  This underpayment results from USAA's intentional failure to fairly and properly determine Actual Cash Value and its knowingly improper downward Condition Adjustments.

**G.     Guidebook Values**

55.     Other entities involved in the automobile business, such as new and used car dealers, and banks and other lending institutions, have never used CCC Reports as a basis for determining a fair valuation or Actual Cash Value of used vehicles.

56.     Such entities have historically used industry-recognized guidebooks as sources for proper used vehicle valuation ("Guidebooks").  These Guidebooks include, NADA, Kelly Blue

Book and Blackbook. These Guidebooks are a proper source for determining Actual Cash Value.

57.     Historically, insurers also used Guidebooks for the purpose of determining proper valuations of total loss vehicles and Actual Cash Value. Indeed, many insurers continue to use the Guidebooks to determine Actual Cash Value when determining whether a vehicle can be repaired or must be declared a total loss.

58.     For example, insurers typically declare a vehicle to be a total loss if the estimated repair costs exceed a percentage, such as 80%, of the pre-loss vehicle valuation.

59.     It is typically in the insurer's best interest to establish a higher value of the vehicle for this purpose, so that the cost of repair is a smaller percentage of the pre-crash vehicle valuation.

60.     However, a number of years ago, insurers determined that they could save substantial amounts of money by using third party valuations prepared by either CCC or a joint venture of J.D. Power/Mitchell.

61.     Accordingly, in the last twenty years, many insurers have adopted the regular practice of using CCC or Power/Mitchell valuations of total loss vehicles, and disregarding the historically-recognized Guidebooks as a source of valuation, to improperly save millions of dollars in adjusting total loss claims.

62.     The valuation products of CCC and Power/Mitchell are not used or recognized by any other "player" in the automobile industry, including dealers or lending institutions.

**H.** **Garrison Has Waived and is Estopped to Assert the Appraisal Provision**

63.    USAA's Preexisting Appraisal Scheme:   During the relevant period of time, USAA had, and continues to have, a standard practice of refusing to reasonably negotiate the Base Value and Adjusted Vehicle Value as reflected in the CCC Reports.   Specifically, USAA has a regular practice of refusing to negotiate in good faith with respect to comparable vehicles, mileage adjustments for comparable vehicles, condition adjustments to the specific total loss vehicle, or comparable vehicle condition adjustments.

64.    USAA knows that its insureds typically have no practical choice other than to accept the total loss payment offered by USAA simply because the insured needs those monies to purchase a replacement vehicle.   Thus, an insured cannot wait on the appraisal process.

65.    USAA has a regular practice of threatening to withdraw its offer to pay a total loss if the insured requests an appraisal.   An appraisal process, including selection of an umpire may take forty-five (45) days or more.

66.    This threat of withdrawal of its offer, combined with delay and expense to the insured of an appraisal, as alleged below, present bad faith obstacles to a fair appraisal.   USAA simply "stands pat" unless it is sued.

67.    USAA knows that if USAA insists on "standing" on the CCC valuation, the great majority of insureds will simply capitulate and take the USAA total loss payment.

68.    USAA also had, and continues to have, a regular practice that USAA does not demand an appraisal unless and until an insured files a lawsuit.   USAA does not include the appraisal provision in its policies for the appropriate purpose of a cheap and efficient resolution, on a timely basis, of disputed first party total loss claims.   As stated, even where there is a clear

and material dispute with an insured, USAA does not demand an appraisal unless a lawsuit is filed.

69.     <u>Prejudice to Plaintiff and Other Insureds</u>:   USAA's scheme to not invoke the appraisal unless and until there is litigation materially prejudices USAA insureds, including Plaintiff, in several material ways.

70.     First, USAA typically sells the salvaged total loss vehicle to one of two companies, Copart or IAA.   These companies pay a salvage value to USAA and then market salvaged parts from total loss vehicles.   The total loss vehicle is typically sold by USAA and salvaged for spare parts in thirty (30) to forty-five (45) days after the total loss.

71.     USAA has actual knowledge that if an insured disputes USAA's total loss payment but does not demand an appraisal, the total loss vehicle will be unavailable for inspection and appraisal after such salvage.   Thus, USAA knows that if it does not request an appraisal for months or even years, and then does so only if and when litigation is filed against USAA, the total loss vehicle will be unavailable for physical inspection and appraisal.   Plaintiff's vehicle, of course, has been salvaged and is not available for an inspection.

72.     USAA also knows that industry-recognized information regarding comparable used vehicles listed for sale at the time of a loss from sources such as AutoTrader and Cars.com is no longer current after about ninety (90) days.

73.     The only possible appraisal after the vehicle has been salvaged is what is known in the industry as a "desktop" appraisal, which is based upon the limited information available a year or two years after the total loss.

74.     The prejudice to insureds such as Plaintiff is clearly illustrated by the information regarding the "vehicle condition," which is listed in CCC Reports.   See Exhibits A and B at 7.

Consistent with its standard practice, CCC lists purported "component condition" (including mechanical, tires, paint, body, glass and interior).

75.     When the vehicle is unavailable at the time that USAA demands an appraisal, it is obviously impossible to fairly review the actual condition of each of the listed "component" conditions based upon an inspection.  Thus, Plaintiff has been deprived of the right to proper inspection-based appraisal as a result of USAA's delay and the salvage of his vehicle.

76.     <u>Cost as a Deterrent to an Appraisal</u>:  In addition, the fact that the appraisal provision requires that the insured pay for the cost of an appraiser and share the expense of a third party umpire is intended by USAA, and is, in fact, a significant and improper deterrent to insureds such as Plaintiff with regard to invoking the appraisal provision.  This is because the cost to Plaintiff of an in-person inspection by an appraiser, and the fees and expenses of a third party umpire, may well-exceed $1,000.

77.     For all of these reasons, based upon its pre-existing scheme regarding untimely utilization of the appraisal provision and the clear prejudice to insureds such as Plaintiff, USAA has waived, and are estopped from, invoking the appraisal provision in the Plaintiff's Policy.

## CLASS REPRESENTATION ALLEGATIONS

78.     Plaintiff brings this class action individually and on behalf of all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The Class consists of:

> All persons and entities that have made first-party claims since November 26, 2015 under an automobile insurance policy issued within the state of Florida by USAA whose vehicles were declared a total loss by USAA and were valued using CCC's total loss valuation system.

79.     Plaintiff excludes from the Class Defendants USAA and CCC, all related entities, subsidiaries or affiliates of said Defendants, any entity in which said Defendants have a controlling interest, and any and all of said Defendants' employees, affiliates, legal representatives, heirs, successors, or assignees.

80.     Plaintiff also excludes from the Class any person or entity that has previously commenced and resolved a lawsuit against said Defendants arising out of the subject matter of this lawsuit.

81.     Plaintiff also excludes from the Class the Judge assigned to this case and any member of the Judge's immediate family and staff.

82.     **The Condition Adjustment Subclass:** This Subclass consists of Florida insureds whose total loss claims were reduced by negative or downward condition adjustments to either purported comparable vehicles, to the Plaintiff or Class Member's total loss vehicle, or both.

83.     **The Market Value Subclass:** This Subclass consists of all Florida insureds whose vehicles received CCC Reports with Adjusted Values which were less than Actual Cash Value as established by Guidebooks.

84.     **Numerosity:** Both Subclasses are numerous that joinder of all affected persons would be impracticable. Although the exact number of Subclass members is unknown, the Florida Subclasses are estimated to comprise many thousands of people who have sustained total losses to their vehicles while insured by USAA.

85.     **Commonality:** Numerous questions of law and fact are common to Plaintiff and the Class and predominate over any individual questions. These legal and factual questions include, but are not limited to:

a.   Whether USAA failed to properly investigate and determine that CCC Reports and Methodology are statistically invalid;

b.   Whether USAA has actual knowledge that CCC Reports and Methodology are statistically invalid;

c.   Whether USAA's Florida Policy required it to pay Actual Cash Value to its Florida insureds on a basis that was statistically valid;

d.   Whether USAA breached its contracts of insurance with its Florida insureds by improperly underpaying total loss claims through the use of statistically invalid CCC Reports and Methodology;

e.   Whether USAA failed to pay Actual Cash Value to its Florida insureds;

f.   Whether CCC Reports and Methodology properly calculate the Actual Cash Value of total loss vehicles at the time of the loss;

g.   Whether USAA has intentionally and systemically underpaid total loss claims to Plaintiff and the Class by using statistically invalid CCC Reports;

h.   Whether Plaintiff and the Class have sustained damages;

i.   Whether Defendants have been unjustly enriched as a result of the scheme described herein; and,

j.   Whether USAA and CCC have conspired, as alleged herein.

86.   **Typicality:** Plaintiff's claims are typical of the claims of the Class Members, as Plaintiff and all Members of the Class have suffered damages as a result of Defendants' unlawful and deceptive scheme of settling total loss vehicle claims for substantially less than the actual replacement costs of such vehicles. Specifically, the total loss claims of the Class Members were

adjusted by USAA based upon CCC Valuations. The same discovery and evidence that would be used to support Plaintiff's claims will be used to support the claims of the Members of the Class.

87.     **Adequacy of Representation:** Plaintiff will fully and adequately represent and protect the interests of the Class Members because they share common injuries as a result of the Defendants' conduct that is applicable to all Members of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions. Plaintiff and counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so.  Neither Plaintiff nor his counsel have any interests that are contrary to or in conflict with those of the Class they seek to represent.

88.     **Predominance and Superiority:** This Action is properly maintained as a Class Action pursuant to Fed.R.Civ.P. 23, because questions of law and fact common to Plaintiff's claims and the claims of the Members of the Class predominate over questions of law and fact affecting only individual Members of the Class, such that a class action is superior to other methods for the fair and efficient adjudication of this controversy. The issues in relation to Plaintiff's claims are similar to the issues relating to the claims of the other Members of the Class, such that a class action provides a far more efficient vehicle to resolve the claims rather than a myriad of separate lawsuits. Accordingly, for most Class Members, a class action is the only mechanism by which they could reasonably expect to vindicate their rights. Certification of the Class under Rule 23 is also supported by the following considerations:

a.   The relatively small amount of damages that Members of the Class have suffered on an individual basis would not justify the prosecution of separate lawsuits; and

b.   Counsel in this class action are not aware of any other earlier litigation against Defendants to which any other Members of the Class are a party and in which any question of law or fact controverted in the subject action is to be adjudicated.

c.   By virtue of Defendants' efforts to conceal their scheme, many Class Members may not even be aware that they have a claim.

d.   The prosecution of separate actions by individual Members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action.

e.   Class treatment of predominating common questions of law and fact is superior to multiple individual actions because it would conserve the resources of the courts and the litigants and further the efficient adjudication of Class Member claims.

f.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude their maintenance as a class action.

### Damages Calculations for the Subclasses

89.     Calculation of damages for the Condition Adjustment Subclass is readily manageable. USAA maintains specific information in its electronic database relating to first-party total loss claims identifying each claim in the amount of any negative or downward condition adjustment on each such claim.

90.     In addition, USAA maintains aggregate data on the total amount of negative or downward condition adjustments in Florida (and other states) on an annual basis.

91.     Accordingly, when the Condition Adjustment Subclass establishes that all of the USAA negative or downward condition adjustments are statistically invalid, then each Member of the Condition Adjustment Subclass will be entitled to a refund in the full amount of any such condition adjustment.  As stated, that amount can be readily determined on an individual basis for each USAA first-party insured as well as on an aggregate basis.

92.     In a similar matter, the damages recoverable by the Market Valuation Subclass may be readily determined from USAA's electronic database relating to first-party total loss claims in the state of Florida.

93.     When the Market Value Subclass establishes that "Steps" 2, 3, and 4 of the CCC Methodology for making condition adjustments are invalid and less than Actual Cash Value, then USAA becomes obligated to pay the total loss claim of each Market Value Subclass member based upon the Guidebook valuation imbedded in USAA's electronic database as an alternative and proper determination of Actual Cash Value for each Subclass Member's total loss vehicle.

94.     As in the case of the Condition Adjustment Subclass, such information is readily accessible in USAA's electronic database, and the proper adjustments for each Member of this Subclass can be readily ascertained and determined from that database on an individual basis.

95.     All of the damages claimed in this action on a class-wide basis are readily and easily ascertainable from the USAA electronic database relating to its Florida total loss claims.

96.     Defendants have acted, or refused to act, in a manner that applies generally to the Class, such that final injunctive relief is appropriate as to the Class as a whole.

97.     **Adequacy of Representation:** Plaintiff will fully and adequately represent and protect the interests of the Class Members because they share common injuries as a result of

Defendants' conduct that is applicable to all Members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions.  Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel has any interests that are contrary to or in conflict with those of the Class they seek to represent.

98.    **Predominance and Superiority**: This action is properly maintained as a Class Action pursuant to Rule 23 because questions of law and fact common to Plaintiff's claims and the claims of the Members of the Class predominate over questions of law and fact affecting only individual Members of the Class, such that a Class Action is superior to other methods for the fair and efficient adjudication of this controversy.  The issues in relation to Plaintiff's claims are similar to the issues relating to the claims of the other Members of the Class, such that a Class Action provides a far more efficient vehicle to resolve the claims rather than a myriad of separate lawsuits.  Accordingly, for most Class Members, a Class Action is the only mechanism by which they could reasonably expect to vindicate their rights.  Certification of the Class under Rule 23 is also supported by the following considerations:

    a.   The relatively small amount of damages that Members of the Class have suffered on an individual basis would not justify the prosecution of separate lawsuits; and

    b.   Counsel in this Class Action are not aware of any other earlier litigation against Defendants to which any other Members of the Class are a party and in which any question of law or fact controverted in the subject action is to be adjudicated.

c.  By virtue of Defendants' efforts to conceal their scheme, many Class Members may not even be aware that they have claims against Defendants.

d.  The prosecution of separate actions by individual Members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action.

e.  Class treatment of predominating common questions of law and fact is superior to multiple individual actions because it would conserve the resources of the courts and the litigants and further the efficient adjudication of the Class Members' claims.

f.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude their maintenance as a class action.

<u>**Damages Calculations for the Class**</u>

99.  Calculation of damages for the Class is readily manageable. USAA maintains specific information in its electronic database relating to first party total loss claims, identifying each claim which included any negative or downward condition adjustment on each such claim, and the amount of each such adjustment.

100.  In addition, USAA maintains aggregate data on the total amount of negative or downward condition adjustments in Florida (and other states) on an annual basis.

101.  Accordingly, when the Class establishes that all of the USAA negative or downward condition adjustments are statistically invalid, then each Member of the Class will be entitled to a refund in the full amount of any such condition adjustment.  As stated, that amount

can be readily determined on an individual basis for each USAA first-party insured, as well as on an aggregate basis.

102.    In addition, damages by the Market Value Subclass may be readily determined by comparing proper Actual Cash Values based upon the Valuations of established and industry-recognized Guidebooks.  Values of one or more of these Guidebooks are embedded in the USAA total loss electronic data base.

103.    All of the damages claimed in this Action on a Class-wide basis are readily and easily ascertainable from the USAA electronic database relating to its Florida total loss claims.

104.    Defendants have acted, or refused to act, in a manner that applies generally to the Class, such that final injunctive relief is appropriate as to the Class as a whole.

## Count I – Breach of Contract

105.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 85 as though fully set forth herein.

106.    The USAA Policy issued to Plaintiff constitutes a valid and binding contract.

107.    USAA has breached its Policy with Plaintiff in multiple ways, resulting in the material underpayment of Plaintiff's total loss claims, which include, but are not limited to: (a) failure to properly investigate and confirm the statistical validity of the CCC Valuation Methodology; (b) improper delegation of its obligation to value total loss vehicles, including Plaintiff's vehicle, to CCC; and (c) wrongful failure to properly adjust and pay the amounts due and owed to Plaintiff for his total loss vehicle, sufficient for Plaintiff to obtain a comparable replacement vehicle.

108.     USAA's breach proximately caused Plaintiff's actual damages and the actual damages of the Class. Thus, USAA is liable for compensatory, consequential and incidental damages flowing from its breach of the Policy, as well as attorneys' fees and interest.

109.     This claim applies to all Class Members.

### Count II – Tortious Interference with Performance of a Contract

110.     Plaintiff incorporates by reference the allegations in Paragraphs 1 through 109 as though fully set forth herein.

111.     The Policy obligated USAA to properly investigate the value of Plaintiff's total loss claims using a fair and statistically valid valuation system or methodology, and then to properly pay Plaintiff the appropriate value of his total loss.

112.     At all times relevant hereto, CCC had knowledge that USAA entered into such Policies with its insureds and that the Policies obligated USAA to promptly and properly pay total loss claims. This knowledge is demonstrated by the fact that CCC prepared the CCC Market Valuation Report, which specifically identified Plaintiff and specifically valued Plaintiff's vehicle.

113.     CCC had actual knowledge that USAA used the CCC Valuations to adjust the total loss claims of USAA insureds, including Plaintiff's claim.

114.     CCC also had actual knowledge that USAA typically would refuse to increase total loss valuations beyond the CCC Valuations and that USAA settled the majority of its total loss claims based upon CCC Valuations provided by CCC.

115.     CCC wrongfully interfered with USAA's contractual obligations to Plaintiff by knowingly and intentionally providing USAA with a statistically invalid and wholly arbitrary

total loss valuation for the specific purpose of enabling USAA to underpay the claims of total loss insureds, including Plaintiff's claim.

116.    USAA's breaches that were caused by CCC's unjustified, intentional and malicious interference with Plaintiff's contractual rights under the Policy include: (a) failing to properly value Plaintiff' total losses; (b) using arbitrary and statistically invalid methodology to value Plaintiff' total loss claims; and (c) causing USAA to fail to pay the proper amount due and owed to Plaintiff.

117.    Plaintiff suffered damages as a proximate result of CCC's improper CCC Valuations and resulting tortious interference with the contractual relationship between USAA and Plaintiff and the Class. Therefore, Plaintiff is entitled to recover compensatory and punitive damages, as well as any other such damages, costs or attorneys' fees to which he may be entitled under Florida law.

118.    This claim applies to all Class Members.

**Count III – Breach of Contract Arising from Plaintiff' Status as<br>Third-Party Beneficiaries of the Agreement between USAA and CCC**

119.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 109 as though fully set forth herein.

120.    At all times relevant hereto, CCC contracted to provide USAA with total loss valuations (the "**Agreement**"). The intended purpose of this Agreement was to outsource USAA's valuation of total loss claims for the purpose of satisfying the obligations of USAA to value and pay total loss claims.

121.    As insureds for whom valuations were prepared under this Agreement, Plaintiff and the Class are intended beneficiaries of the Agreement between USAA and CCC and are entitled to sue for breach of that Agreement.

122.    Plaintiff alleges that CCC breached this Agreement by providing USAA with total loss valuations that were not statistically valid and were wholly arbitrary in the manner in which USAA valued total losses, including Plaintiff's total loss claims. The improper CCC Valuations were supplied to USAA by CCC in the course of business for the purported direct benefit of Plaintiff and the Class.

123.    CCC's breach of its Agreement to provide valid total loss valuations to USAA proximately caused damage to Plaintiff.  CCC is, therefore, liable to Plaintiff and the Class as intended third party beneficiaries for compensatory and consequential damages flowing from said breaches.

124.    This claim applies to all Class Members.

### Count IV – Civil Conspiracy

125.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 109 as though fully set forth herein.

126.    USAA and CCC entered into an illicit agreement and conspiracy to utilize CCC Valuations to provide improper total loss valuations. Specifically, USAA and CCC conspired to underpay Plaintiff and the Class by using CCC Valuations, which included the aforementioned statistically invalid Four Steps, which were not intended to calculate the fair value of total loss vehicles, but rather to improperly undervalue total loss claims of USAA insureds.

127.    USAA is a part of the conspiracy by reason of having actual knowledge that the CCC Valuations provided were statically invalid and continuing to utilize the CCC Valuations when determining the payment of Plaintiff and Class Members' total loss claims.

128.    USAA's conspiracy with CCC to use the invalid CCC Valuation Methodology deprived Plaintiff and the Class of the proper value of their total losses. The overt acts emanating

from Defendants' illicit agreement to so deprive Plaintiff and the Class include, but are not limited to, CCC's undervaluation of Plaintiff' claims using CCC Valuations, and USAA's failure to properly investigate, adjust and pay such claims directly resulting from the CCC Valuations.

129.    Plaintiff and Class Members have been damaged as a proximate result of Defendants' illicit agreement and conspiracy. Therefore, USAA and CCC are each liable for the torts of one another arising out of their conspiracy as defined herein, and Plaintiff and Class Members are entitled to recover compensatory and punitive damages against USAA and CCC.

130.    This claim applies to all Class Members.

### Prayer for Relief

**WHEREFORE,** Plaintiff, Capt. Brian Ruby, respectfully requests that this Honorable Court:

A.    Certify the Class alleged herein;

B.    Appoint Plaintiff as Class Representatives;

C.    Appoint the undersigned as Class Counsel;

D.    Award Plaintiff and Class Members actual damages in such amount as the Court or Jury may determine;

E.    Award declaratory and injunctive relief as permitted by law;

F.    Award punitive damages as permitted by law;

G.    Award reasonable attorneys' fees, filing fees, expert fees, litigation costs and expenses to counsel based upon the benefit received by Plaintiff and the Class; and

H.    Award Plaintiff and Class Members any additional relief as this Court deems just and proper, including injunctive relief to prohibit USAA from continuing to utilize CCC Valuations in Florida.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts for which a trial by jury is permitted by law.


Dated:  November 26, 2019                                    Respectfully submitted,

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

*/s/ Jonathan B. Cohen*
Jonathan B. Cohen (FL Bar No. 0027620)
John A. Yanchunis (FL Bar No. 324681)
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-2434
jcohen@forthepeople.com
jyanchunis@forthepeople.com

**WALLER LAW OFFICE, PC**
Jonathan H. Waller (GA Bar No. 734550)*
2001 Park Place, Suite 900
Birmingham, AL 35203
Telephone: (205) 313-7330
jwaller@waller-law.com

*Attorneys for Plaintiff and the proposed Class*

*\* Pending pro hac vice admission*